## DEE CO. et al. v. SUN OIL CO.
### No. 925.

District Court, E. D. Texas, Tyler Division.
Aug. 22, 1940.

Harris, Kiech, Foster & Harris, of Los Angeles, Cal., Royle A. Carter, of San Francisco, Cal., and Lawther, Cramer, Perry & Johnson, of Dallas, Tex., for plaintiff.

Busser & Harding, of Philadelphia, Pa., and T. L. Foster, Gen. Counsel, of Dallas, Tex. for defendant.

BRYANT, District Judge.

This is a suit for infringement of letters patent No. 1,426,955, granted to Lester L. Carter of date August 22, 1922, and involves alleged infringement of claims Nos. 1, 2, 3, 4, 7, 8, 9, 10 and 11 of such patent by the Sun Oil Company in the operation of certain separators known as the J. J. Denton, A. A. King and E. O. Henson separators, the same being designated by reference to described wells upon the leases owned by defendant.

As stated by Carter in his application for the patent:

"My invention relates to separators which are used to remove water and gas from the oil produced by an oil well.

"The principal object of my invention is to provide a device in which the water and gas are removed from the oil as it comes from the well, without danger of emulsification. Where oil and water are produced under pressure by an oil well, there is great danger of their becoming emulsified and the emulsions so produced are often very difficult to resolve into their component parts.

"This emulsification most often occurs when the water and oil are together forced under pressure through a small orifice, such as a small hole or a partially closed valve. Since many oil wells produce oil, gas and water, under considerable pressure and since it is common practice to reduce the pressure by allowing the fluid to flow through such a small orifice, it is evident that there is considerable danger that such emulsions may be formed. *This, I prevent, by separating the fluid into its constituent parts while still under practically full well pressure and by relieving the pressure on the component parts separately.*

\* \* \*

"\* \* \* So far as I am aware, I am the first to provide a device which will remove the water and gas from the oil coming from an oil well, while this oil is still under pressure and which will operate entirely automatically under practical conditions."

The claims in controversy are as follows:

Claims 1, 2, 3, 4, 7, 8, 9, 10, and 11. Claims 5 and 6 are not involved.

The principal controversy has raged about the validity of the claims of the patent and the scope and extent of such claims to the extent that they are found valid, if at all, as well the question of the fact of infringement of valid claims, if any, of the patent.

The art of separating oil well mixtures is an old one and occupies a very crowded field beginning with one of the earliest gas traps on record, which was used on Oil Creek, Pennsylvania, about the year 1865.

Separators, or traps as they are termed in the vernacular of the oil business, are used under varying conditions of pressure from vacuum to a pressure above atmospheric.

The basic principle of gas trap construction is simple in that the mixture of oil and gas is allowed to flow through a chamber large enough to reduce the velocity of the mixture to the point at which the oil and gas tend to separate. The gas, seeking the top of the chamber, is drawn off free of oil; the oil is drawn off at a lower point and the escape of the gas through the oil discharge opening is prevented. Traps have been constructed to meet a variety of conditions, and it is accepted belief that gas can be saved from any well under control, and that if a trap is properly installed there should seldom be interference with the production of oil, and it is thought that any condition at a well can be met by one or more of the traps described as having been in commercial use prior to the patent

issued to Carter. Tech. Paper 209, Department of Interior 1919.

Traps have been used on all kinds of wells, from those producing a few gallons of clear oil daily while a vacuum is maintained on the trap, to those producing daily several thousand barrels of oil carrying much sand or water and several million cubic feet of gas under pressures of several hundred pounds per square inch.

The type of trap depends largely on the use that is to be made of the gas. Traps are grouped under three general types or classifications, consisting of upright cylindrical, horizontal tubular, and special. Those of the first type are principally used on wells of small capacity, while the second type is especially used for large wells of the gusher type, and traps of the third type are used under certain special conditions. Tech.Paper 209.

Upright cylindrical traps are often equipped with an outflow valve which operates mechanically and controls the amount of oil within the trap. Such traps are of two general forms, those actuated by an inside float, and those actuated by the weight of the oil.

The oil well low pressure trap shown in figure 6 of Tech.Paper 209, is one of the simpler forms of automatic traps. Four openings, (a), are provided in the top for the inlet of the oil. The gas escapes at (b), and the oil through the rotary valve (c). The ball float (d) controls the height of oil in the chamber.

"Traps under pressure are used chiefly on large flowing wells. In many fields flowing wells if allowed to flow without restriction would produce large quantities of sand, and the casing would soon collapse. In California the wells usually flow through a restricted opening or reducing nipple to keep back pressure against the oil. This lessens casing troubles and the amount of sand produced, but in many wells an emulsion of water and oil was formed which was difficult to treat. Removal of the reducing nipple between the well and the trap and keeping pressure on the trap prevented emulsion, which seemed to take place during the expulsion of the oil through the opening. The restricted opening, or 'bean', as it is locally called, is now often placed in the trap discharge, though the common practice is to place it at the well.

"One of the first effects from the use of gas traps noted by operators was that the oil had a lower specific gravity when delivered through a trap under pressure. Also, at many wells when traps were installed an apparent increase in production of oil resulted, or the rate of decline was temporarily arrested. This can be attributed to reduced volatilization losses. Some remarkable improvements in specific gravity have been reported, but it is possible that emulsified water, which is less prominent in oil handled under pressure, interferes with the determination of specific gravity as done in the field. Determinations by the chemists of the Bureau of Mines have demonstrated that with pressures of approximately 50 pounds in the trap, the oil produced has been improved in gravity from 1 to 2.5 deg. B. and the amount of light hydrocarbons distilling over at temperatures below 200 deg. C. has been increased as much as 4 per cent. In some wells an increase in the pressure results in deteriorated oil; thus, one well showed a heavier product with the trap at 100 pounds than when the oil was not under pressure. The oil probably absorbs dry gas at the higher pressure, and on the release of pressure at the outlet of the trap this dissolved gas rapidly escapes and carries off gasoline vapors. The critical pressure for each well can be determined by trial, and it varies from well to well." Tech. paper 209, pp. 29, 30.

Claim 1 of the patent in suit is as follows: "A device for separating gas from a mixture of gas and liquid, which comprises: walls forming a separating chamber into which the mixture is delivered, and in which the gas is allowed to escape from the liquid; means for withdrawing gas from said chamber and reducing the pressure thereof; a trap into which liquid from said chamber is delivered; means in said trap for preventing gas from blowing therethrough; and means for allowing liquid to escape from said gas trap whenever a definite amount collects therein."

It should be noted that this claim is not limited to the separation of gas, oil and water, but is directed broadly to the separation of gas and any liquid.

I find that this claim is invalid for lack of invention and that it is clearly anticipated by the prior art, and particularly by Jones No. 1,255,018, by Trumble No. 1,269,134, by Gilmore No. 554,598, and by Newbold No. 689,366.

The Jones patent discloses separating chamber (b) to which the well line is de-

livered and in which the gas is allowed to escape through pipe (h). The means for withdrawing gas from this chamber and reducing the pressure thereof are at a pipe (h) and throttling valve (c). The trap to which liquid from the chamber is delivered is the chamber (o) into which is delivered the oil. The concluding language of the claim: "Means in the trap for preventing gas from blowing therethrough and allowing liquid to escape therefrom whenever a definite amount collects therein", is merely a statement of the function of the trap, and this means namely the float (p) and valve (p') as present in Jones.

The Newbold patent, numbered as above, reads clearly on this claim except that he does not show a valve in his gas outflow pipe for reducing the pressure thereof. However, since such a valve is so common in the art there is nothing of patentable novelty defined in this claim over the Newbold patent.

The Trumble patent as above shows a separating chamber into which the mixture is delivered and in which the gas is allowed to escape from the liquid. It shows means for withdrawing gas from a chamber and reducing the pressure thereof, namely, the gas outflow pipe (10), and valve (11) thereon. See Fig. 1. It shows a trap for controlling the outflow of liquid from the chamber. The trap shown by Trumble would not respond to the exact language which qualifies the word "trap" in Claim 1, as Trumble says any form of trap may be used.

Gilmore discloses separating chamber (18), into which the mixture is delivered and in which the gas is allowed to escape from the liquid.

I find that Claim 10 is invalid and anticipated by Jones No. 1,255,018, Taber No. 13,663,487, Cooper No. 815,407, Trumble No. 1,269,134, and Collins No. 1,140,118.

I find that Claim 11 is invalid and anticipated by Jones as above and Taber as above.

Claims 2 and 4 provide respectively as follows:

"2. A device for separating water and gas from a mixture of water, gas and oil as produced by an oil well, comprising: walls forming a separating chamber in which said water and oil are allowed to stratify, and in which said gas is allowed to escape from said liquids; means for withdrawing oil from said chamber to maintain the level thereof within certain limits; and means thereof within certain limits; and means for withdrawing water from said chamber whenever the level of said water exceeds a certain limit."

"4. A device for separating water and gas from a mixture of water, gas and oil as produced from an oil well, comprising: walls forming a separating chamber in which said water and oil are allowed to stratify, and in which said gas is allowed to escape from said liquids; means for withdrawing oil from said chamber to maintain the level thereof within certain limits; means for maintaining substantially the full pressure of said well in said chambers; and means for withdrawing water from said chamber whenever the level of said water exceeds a certain limit."

The separator disclosed in the Carter patent No. 1,426,955 comprises a single chamber (13) (Exhibit 63) into which oil from the well, having mixed therewith water and gas, is admitted and in which the water, oil and gas stratify. The gas escapes at the top and the water at the bottom, and the oil from the upper portion of the oil layer.

The water flows into a vertical pipe the upper end of which is a little below the oil outlet so as to establish a hydrostatic balance between the column of water in the pipe and a column of water and oil emulsion and oil in the separator.

Both the oil and water are discharged through ordinary steam traps of the bucket type which prevent any free gas that may be associated with the liquid from blowing therethrough. The traps and the balancing water column are vented to the gas space in the separator to equalize the pressure.

The oil is conveyed, at necessarily reduced pressure, to a tank which is vented to allow the escape of gas and which is provided with an overflow for oil and a pipe through which any water settling to the bottom may be withdrawn at any time by manually opening a valve thereon.

The separator (13) is of that type in which the water, oil and gas tend to stratify in a single chamber and from which the gas escapes and from which the water and oil are withdrawn. It is impracticable, in such a triple action single separating chamber, to admit the oil from the well into the gas space of the chamber, since the upper part of the liquid column would be subject to such agitation or disturbance as would prevent the formation of a quiescent top layer of oil, which is necessary in order to

secure the intended continuous outflow thereof. If the mixture from the well were introduced into this gas space, there would be an emulsion of oil, water and gas at the top of the liquid column; and the gas at the top of the chamber would contain considerable water and oil in suspension, which would escape with the gas. With a view to avoiding or minimizing these conditions, the Carter patent introduces the mixture from the well at an intermediate part of the liquid column. From the patent specification and drawing and from the description of Mr. Stokes, an expert witness for plaintiff, it would appear that the water level in the oil-water-gas separating chamber coincides with the point at which the well fluids enter the separator. This is not in fact the case. A loose emulsion of oil, water and gas is formed within a zone of indefinite extent extending above and below the outlet mouth of the oil-water-gas infeed pipe (12) unless the well is restricted to an extremely low rate of flow. The upper level of the water from which substantially all the oil is relieved would be somewhat below the point of entry, while a comparatively shallow zone of water-free oil would form in the upper part of the liquid column.

This arrangement for introducing the oil well mixture into the separating chamber avoids, in some degree, the objection to the admission of the oil well mixture into the gas space of the separating chamber, but it is still objectionable and would be unacceptable for modern commercial use, because the separation of the gas from the oil and water must all occur within the body of the liquid in the separating chamber, and the constantly uprising gas must of necessity maintain the middle zone of emulsion and the upper zone of oil more or less agitated, while the gas finally escaping from the oil into the gas discharge pipe (70) would contain a great deal of oil in suspension therein. This is especially true when operating under high pressures. It is quite possible, for this reason, that the patentee found it necessary to provide the elaborate devices shown in the patent for condensing and recovering the valuable liquid constituents carried off with the gas.

The construction and operation of the separator chamber of the patent is thus outlined because all the claims except 1, 10 and 11, are expressly limited to such a chamber, that is, a "chamber in which water and oil are allowed to stratify and in which said gas is allowed to escape from said liquids". Such limitation is omitted from claims 1, 10 and 11, which emphasizes the fact that the limitation in the other claims is intentional.

None of defendant's separators contain such a separating chamber.

Defendant's King well separator and defendant's Henson well separator are substantially identical, but differ from the Carter separator in that they provide for a distinctly two-stage separation, which requires two dissimilar chambers, the gas being separated in a gas separation chamber (a), from which the emulsion of oil and water flows through a constricted pipe (c) into a water settling chamber (d). In chamber (d) the liquid column is quiescent, since practically all the gas has been separated therefrom in the gas separating chamber (a). Such conditions are extremely favorable to separation, and the oil level is not disturbed by the flow of a large volume of gas therethrough and the outflow of oil is continuous and uniform.

The control of the water and gas outflow is effected, as in the Carter patent and as is common in the prior art, by a hydrostatically balanced column of water. Traps similar to those in the Carter patent and to those common in the prior art are placed on the water-outlet line and oil-outlet line, to prevent gas blowing therethrough, and pipes connect the gas spaces of the liquid outlets and the water settling chamber with the gas space of the gas separating chamber, as was well known in the prior art, to promote pressure equilibrium between the chambers connected.

In the Carter patent, the oil flows to a receiving tank just as in all gas-water-oil separators, which, of course, is under reduced pressure.

In all such separators the oil-receiving tank is provided with a gas vent, from which gas that has been released by the reduction of pressure escapes. As in all such oil-receiving tanks, provision is made for withdrawing the oil therefrom, the only addition being the provision of a water-outlet pipe and a manually operable valve for drawing off, from time to time, any water settling therein.

Inasmuch as the Carter patent operates under the principle of introducing the oil-gas-water mixture from the well into the liquid body in a single separating chamber wherein is supposed to occur stratification of gas, oil and water and their separate outflow, and inasmuch as the King well

separator and the Henson well separator, instead of a triple action simultaneous separation, as shown by Carter, operate on the principle of first separating the gas from the oil-water emulsion, and then in a separate chamber separating the oil from the water, there can clearly be no infringement of the above numbered claims by such acts of the defendant, conceding the validity of the Carter claims outlined above.

The Denton well separator operates upon a still different principle and is clearly not an infringement in any respect of the above numbered claims of the Carter patent.

In this separator the oil-gas-water mixture flows into a separating chamber wherein the water is separated from the oil and gas, the oil and gas flowing through a common conductor pipe into another chamber wherein they are separated one from the other in the absence of water.

In the main tank of the Denton well separator, which is the lower of the two tanks in the drawing (Exhibit 67), the horizontal dotted line represents the Interface between the water and the oil-gas emulsion, valve (5) opening to allow outflow of water whenever the oil reaches this level. Gas and oil, under the prevailing well pressure, are forced out at the top of the water separating tank through a flow-bean or throttling device which reduces the pressure, the mixture of oil and gas being conveyed through the same conductor pipe to the upper of the two tanks. The dotted line (22) below the low pressure tank represents the interface between oil and gas.

Whenever the oil reaches that level, the valve (11) opens to allow the discharge of the oil to the receiving tank. The gas outflows from the top of this low pressure tank.

There is clearly and obviously no infringement of the above recited claims of the patent by the Denton separator.

There are just three ways of separating oil, gas, and water: One, they are separated in the same chamber; the second is to separate the water from the oil and gas in one chamber and then separate the gas from the oil in another chamber; the third is to separate the gas from the water and oil in one chamber and then separate the water from the oil in another chamber.

The Carter patent in suit represents the first method. The Denton separator represents the second method. The King and

Henson separators represent the third method.

In the King and Henson separators the chamber in which the water and oil are allowed to stratify is not, as the claims require, the chamber from which the gas escapes. There are no means, as the claims require, for withdrawing water (except in admixture with oil) from the chamber in which the gas escapes. The water and oil do not stratify and no oil level is maintained in the chamber from which the gas is allowed to escape.

Claims 3 and 7 of the patent read respectively as follows:

"3. A device for separating water and gas from a mixture of water, gas and oil as produced by an oil well, comprising: walls forming a separating chamber in which said water and oil are allowed to stratify, and in which said gas is allowed to escape from said liquids; means for withdrawing oil from said chamber to maintain the level thereof within certain limits; walls forming a chamber having its upper portion in open communication with the upper portion of said separating chamber; a pipe in open communication with the lower portion of said separating chamber, said pipe projecting into said water outlet chamber to a point a little below the predetermined level of oil in said separating chamber; and means for withdrawing water from said water outlet chamber, whenever the level of water therein exceeds a predetermined value."

"7. A device for separating water and gas from a mixture of water, gas and oil as produced by an oil well, comprising: walls forming a separating chamber, in which said water and oil are allowed to stratify, and in which said gas is allowed to escape from said liquids; means for withdrawing oil from said chamber to maintain the level thereof within certain limits; means for maintaining substantially the full pressure of said well in said chambers; the walls forming a chamber having its upper portion in open communication with the upper portion of said separating chamber; a pipe in open communication with the lower portion of said separating chamber, said pipe projecting into said water outlet chamber to a point a little below the predetermined level of oil in said separating chamber; a water trap in open communication with the lower portion of said water outlet chamber; means in said trap for preventing gas from blowing through said trap; and

means in said trap for discharging water therefrom whenever said trap becomes filled with water."

Claim 3 recites the same elements as are recited in Claim 2, but is in addition limited to a specific water withdrawal construction, namely, "a chamber (51) having its upper portion in open communication (through pipe (54)) with the upper portion of said separating chamber, a pipe (50) in open communication with the lower portion of said separating chamber, said pipe (50) projecting into said water outlet chamber (52) to a point a little below the predetermined level of oil in said separating chamber."

The only advantage of applying to the usual water outflow pipe a contrivance of this type is that it facilitates adjustment of the relative levels of oil and water, which is necessary when handling oils of different densities.

The device, however, is a very old one and is commonly applied to water outflow pipes to balance the column of water and oil in the oil-water separating chamber.

Sepulchre No. 1,395,889 discloses the precise specific apparatus set forth in claim 3. This old contrivance was also frequently applied to the adjustment of the oil outflow pipe. So applied, it performs the same function as when applied to the water outflow pipe. See Franke No. 654,965 (patented 1900), wherein he states: "This adjusting device 13 and nipple 14 are used for the purpose of raising or lowering the maintained water-level in the said tank 1 by lowering or raising the top edge of said nipple 14, and thereby decreasing or increasing the difference in height between the water-outlet and the oil-outlet levels by forcing the oil to flow up through said nipple 14 over the top of the same and then out through the oil-outlet tube 12."

Claim 7 recites the specific construction of claim 3 plus a water trap to prevent gas from blowing through with the water, plus operation under well pressure. Unlike the other claims, there is no single patent of the prior art which discloses every element of the complete combination. But if the separator is operated under well pressure, and if the water is to be automatically withdrawn, a trap of some kind must be inserted in the water outflow pipe to prevent gas from blowing through with the water. Where expedients of this kind well known in the art (plaintiff's Los Angeles depositions, pp. 101 and 106, and San Francisco deposition, p. 146), where a separator is operated under pressure, must be applied to the separator, it involves no invention to apply it.

■ Since every element in this claim of construction is old and functions in the old and well-known way, such claim does not define a new and patentable combination, but an unpatentable aggregation of old and well-known elements. See Jones-McLaughlin, Inc., v. Amerada Petroleum Corporation, 10 Cir., 47 F.2d 828.

Claims 8 and 9 of the patent read respectively as follows:

"8. A gas and water separator for use in connection with oil wells, comprising: walls forming a chamber into which a mixture of oil, water, and gas are delivered at full well pressure, and in which said oil and water stratify and said gas escapes from said oil and water; means for withdrawing gas from said chamber; means for automatically withdrawing oil from said chamber in such amounts as to maintain an approximately constant level of said oil in said chamber; and means for automatically withdrawing water from said chamber in such amounts as to maintain an approximately constant level of said water in said chamber.

"9. A gas and water separator for use in connection with oil wells, comprising: walls forming a chamber into which a mixture of oil, water and gas are delivered at full well pressure and in which oil and water stratify and said gas escapes from said oil and water; means for withdrawing gas from said chamber; means for automatically withdrawing oil from said chamber in such amounts as to maintain an approximately constant level of said oil in said chamber; and means for automatically withdrawing water from said chamber in such amounts as to maintain an approximately constant level of said water in said chamber, said means being so arranged that substantially the full well pressure is maintained on said chambers."

Claim 8 differs from claim 4 only in requiring that the withdrawal of water as well as oil shall be automatic so as to maintain a constant level of water as well as of oil in said chamber. But this is a characteristic feature of so many oil-water separators that there can be said to be nothing exceptional about it.

Claim 9 is substantially identical with claim 8.

■ Accordingly, I find that Claims 2, 3, 4, 7, 8, and 9 of the patent in suit are limited by their express terms to a single separating chamber in which oil and water stratify and in which gas is allowed to escape to the stratification of the oil and water and the maintenance of an oil level in the chamber from which gas is allowed to escape and to the separate withdrawal of oil and water from the chamber in which the gas is allowed to escape.

No claim is made in the patent for any process or method of preventing emulsification, yet this litigation seems to have been inspired by the thought and belief on the part of applicant, Carter, that he was the sole and original discoverer of the process of preventing emulsion.

However, as pointed out in Technical Paper No. 209 published by the Government Printing Office in 1919, it was recognized that: "Removal of the reducing nipple between the well and the trap and keeping pressure on the trap prevented emulsion which semed to take place during the expulsion of the oil through the opening."

■ I think that the only thing to which Carter can justly make claim of patentable novelty is that of a single separating chamber in which oil and water stratify, and in which gas is allowed to escape to the stratification of the oil and water and the maintenance of an oil level in the chamber from which gas is allowed to escape and to the separate withdrawal of oil and water from the chamber in which gas is allowed to escape, and that he is limited in his claim of inventive apparatus or device to the specific construction described in the patent and as shown in Plaintiff's Exhibit 63, and that none of such claims, conceding the patentability of those not found invalid for want of patentability, are infringed by any apparatus or device of the defendants.

While indulging the presumption of patentability to the extent indicated, I am impressed with the testimony of the witness, Foran, to the effect that the device or apparatus as devised by Carter was of no value from a commercial standpoint, as the same has apparently never been used to any extent, except upon the Gosnell well.

While Carter testified that about thirty of these devices were used by the Shell Company in seven California fields, yet I find his testimony so vague and indefinite about this that I cannot reconcile the separators so constructed with the device invented by Carter, because in his testimony he says that such separators were constructed "with modifications of his design". He further says, with reference to these devices that: "Oil and gas discharged through the same valve in a few of the separators and water discharged through a separate valve". He further says that he did not design or construct the thirty separators so used by Shell.

Aside from this, and notwithstanding the wide spread demand for the use of such devices, I find no other suggestion in the testimony of commercial use by anyone of a device or apparatus as designed by Carter, and do not consider it to be of any practical utility, because of the inherent difficulty in effecting a triple action separation of such volatile constituents in a single chamber.

Accordingly, this opinion is filed, incorporating the above findings of fact and conclusions of law of the court, pursuant to which decree may be submitted for defendant within twenty days from the date hereof.